Mr. Lieberman. And we do have 30 minutes per side, correct? Correct. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Michael Lieberman, along with my colleague Randy Bowman. We are here representing Mr. Carlos Cuesta-Rodriguez, the petitioner appellant in this case. There are two main issues raised in this appeal. The first involves the ineffective assistance claims and all the procedural hurdles at play there. And I will spend the majority of my time addressing that, but I do want to spend a few minutes at the end, if possible, addressing the issue of the moral culpability boundary for mitigation evidence. To start with, I want to note that Mr. Cuesta-Rodriguez has a very strong claim on the merits of ineffective assistance of trial counsel. Unfortunately, due to a hopelessly conflicted direct appeal counsel and everything that flowed from that, no court has ever heard that claim. And Mr. Cuesta-Rodriguez has never had a fair opportunity to present his ineffective assistance of counsel claim. This court can give him that opportunity, and that's what we're here seeking. Let's start on the hopelessly conflicted element, because that really is a central hurdle that we need to walk through or overcome first. I agree. Why don't you go through what the conflict is, and if you could focus on whether your position is it's really a system-wide defect in the way Oklahoma does this, or there's something case-specific here that shows that even if the system's adequate under Martinez and Trevino, that Mr. Cuesta's appeal was not? That's a very, very fair question, Your Honor. And I believe the answer actually falls somewhere between the two alternatives that Your Honor proposed. It's not completely systemic in terms of every defendant in Oklahoma not getting a fair shot. But due to an Oklahoma statutory scheme that requires every capital defendant in Oklahoma and Tulsa counties to be represented by the same attorneys, essentially, at both the trial and direct appeal levels, we would analogize this situation very similarly to Trevino, in that the practical effect of the statutory scheme at issue has the effect of depriving Oklahoma County and Tulsa County capital defendants, at least at a presumptive level, of a fair opportunity to present their ineffective assistance of counsel claim. Now, let me put some meat on those bones and explain what I mean by that. Is it presumptively conflicted or presumptively not conflicted under our most recent cases, would you say? Well, I would say under Cannon, which is the case that most directly addresses this precise issue, it's presumptively conflicted. What Cannon said in this court in remanding it was that there's an inherent conflict involved when the same office represents the person at both levels. And what Cannon did, and I think this is a significant point, Cannon remanded the case to give the state the opportunity to ask for an evidentiary hearing if the state wanted to try to overcome that presumption. I thought that Cannon established a principle, but made it a case-specific inquiry. And what I meant by case-specific is not necessarily the individual, but the office in question. And so your initial statement that somehow or other, just because you have an office where the appeals and the trial take place, that that in some sense is presumptively conflicted, I didn't understand that to be the case at all. I mean, that there's a concern, but then you have to look and see what the circumstances are. Do you have somebody, does the office have a policy that says we don't bring ineffective assistance of trial, ineffective assistance of counsel claims? I mean, isn't that what we need to do in these situations? Precisely, and that is precisely what an evidentiary hearing in district court is perfectly well-equipped for, which is what we were seeking. What my reading of Cannon is that this court identified that there is an inherent difficulty and that you need to look at the specific details. Now, to be clear, in Cannon, one of those specific details was a policy. Cannon doesn't require in our reading that we have to prove that there's a policy. Well, it would seem you'd have to make some sort of showing. And it seems to me that, yes, there was a remand for an evidentiary hearing in Cannon, but it was predicated upon a showing that there was a real deal. And I mean, in habeas cases, generally, you get an evidentiary hearing when you establish that, based upon this showing that I've made, that if, when I go back and do my evidentiary hearing, I would win. But, I mean, so that means you've got to give us something more than, you know, it's Oklahoma County and they've got a trial and appellate people in the same office, right? Correct, and we did in this case. We established that the trial counsel and the direct appeal counsel had adjacent offices, that this direct appeal counsel didn't have a habit of raising ineffective assistance counsel claims. I thought the evidence was to the contrary. Based upon the cases that were cited, there were at least one case, right, where they brought, where appellate counsel brought an ineffective assistance counsel claim against the trial counsel. In the Nick Davis case, Andrea Miller, who was the appellate counsel in this case, inherited a direct appeal that had already been filed by a different lawyer in the office that included an ineffective assistance of counsel claim. That hearing went particularly poorly, and as a result, it's our understanding that Ms. Miller has never again brought such a claim. Has that office routinely brought, is this a lawyer, is your argument really lawyer-specific proximity and disillusionment versus, I gather there's no policy you would have cited as to it, but does that office routinely bring ineffective assistance cases against the trial lawyers in the same office? Sometimes yes, sometimes no, but I believe, and a point I really want to be clear about, it's important for this court to focus on the nature of the ineffective assistance of counsel claims that we're talking about. It would be uncomfortable for me to bring a claim that Mr. Bowman didn't ask the right questions at trial, or that Mr. Bowman didn't ask for the correct jury instruction, or that Mr. Bowman didn't cross-examine a witness appropriately. That's uncomfortable, but lawyers do things that are uncomfortable a lot. The nature of the conflict in this case is that the trial lawyer couldn't get money from Bob Ravitz, who's the head of the Oklahoma County Public Defender's Office, and therefore didn't call certain types of experts to testify at trial. Now, what direct appeal counsel would have had to do would have been to go back to Bob Ravitz and say that money that you refused to give at the trial level was so constitutionally unreasonable that I now want you to give me that money so that I can hire those experts to prove how constitutionally unreasonable your past behavior was. That's where the conflict in this case comes in. So would I be comfortable challenging Mr. Bowman's performance? No. Would it be exceedingly more difficult for me to have to go to, let's say, Ms. Otto, and ask her to give me money to prove how unreasonable a decision of hers was? That's a totally different position to put a lawyer in. It depends on what the culture of the office is, and I didn't understand that to be the thrust of your argument at all. I mean, your argument in your opening brief seemed to trap what was going on in canon in the notion that there was proximity, the fact that there would be an issue of whether she could bring ineffective assistance of counsel claims. I know there is the issue of the note about whether to do a neuropsychological examination, but this business that somehow or other, the conflict is she can't pursue her ineffective assistance of counsel claim because of the inhibition of the head of the office. Where is that? Well, specifically in the motion for evidentiary hearing that was filed in the district court. I'm talking about your appellate brief, and that's what counts right now. Okay, well, we didn't make that argument in those terms. Thanks for keeping me from Suneldi. That's good. Go ahead. We did talk, though, about the untenable position of having to use office money to challenge office conduct, and that's essentially what I'm talking about, is the use of office money to challenge prior decisions made by the same office. If there are examples, however, and as I understand it, there are from the State, then that exact thing has been done, then, I mean, that's a problem. I mean, it would seem to me you've accepted the notion you have to make some sort of showing. Well, if you don't have even the allegation of a policy here, and you have examples of the lawyers in that office, maybe it is uncomfortable. I don't know how they run that office. Maybe it is uncomfortable, but they do it, and if they're doing it, then I don't see where the problem is, and I want to follow up on one of Judge Tempovich's questions, but please respond as it relates to what then becomes the nature of the showing. I will, and I'll start to answer that question by pointing to the facts of Trevino. The Supreme Court in Trevino didn't say that no post-conviction counsel in Texas are ever able to file a new trial motion within the time limits given by the Texas statute and the Texas rules. They simply said that the rules put such an unreasonable burden on that that it didn't really provide a fair opportunity to do that. So the fact that in some cases some lawyers might be able to do it doesn't change the fact that in this case, for Mr. Cuesta Rodriguez, based on the statutory scheme that he was forced to operate under, he had a lawyer that wasn't able to do it. Well, that's a fair point, but you have to look then structurally at what the issues are that would lead to the results you're talking about, which takes you back to what in the office, structurally, would result in making it unlikely, would place such a burden on the ability of counsel to avoid conflict and do their job, and that's what I'm asking about, because it seems to me that unlike Cannon, where you had, to use your phrase in another context, bright red flags, as it relates to the question of whether they would have a conflict, i.e., the policy, you don't have that here. I mean, you have an office that's doing their thing, and unless there's something structural you can point to, I don't see that they are there. Well, the problem is to point to something structural requires the people in the office that are operating under the conflict to be willing to tell us those things, which is what an evidentiary hearing would design. We believe that we made the best showing we could make, which is that Andrea Miller was willing to go on record and say she did absolutely no extra record investigation. She did no, hired no experts, looked for no experts, and did no investigation. But at the time she gave us that affidavit, she was operating under the very conflict that we're complaining about. But couldn't she have, in that same affidavit, said that she was inhibited from raising an IAC claim because of, you know, office culture? I know you want an evidentiary hearing to tease that out, but I'm kind of looking for a proper, you know, on that point, something to hang our hats on. Well, I want to be careful in giving this answer so that I'm not being even remotely misleading. I suspect that if put under oath and forced to answer those questions that Ms. Miller would in fact say that. Do I know that for a fact? I don't because the same tensions that prevent them from doing it prevent them from explaining to everybody why they couldn't do it in the first place. It's a lot different when you're in a courtroom with a federal judge putting you under oath and telling you you have to tell the truth. I think the truth tends to come out more clearly at evidentiary hearings than when we go to somebody and ask them to please give us an affidavit that's then in writing that their boss can then put in their personnel file and hold on to. So at a minimum, we believe an evidentiary hearing is required to help determine whether this case falls into the canon category or doesn't. Let me get back to a point that Judge Temkovich raised and playing off of that as it relates to the nature of your claim here. Trevino is sort of a systemic claim. In order to prove, be able to get to the point to access Trevino, you're looking at the overall structure as opposed to and in that context, the situation with Miller is illustrative of the overall problem. That's different than saying what I'm really focused on is whether Miller herself had a conflict. I take it the former really is what's at play here because that's what you need for a Trevino claim, right? Correct. Okay. And just to be clear, what Trevino says is when the overall structure makes it impractical that the ineffective assistance of counsel claim can be are represented by the same office, that makes it impractical. And it's an easy fix. They could switch it so that Tulsa County does direct appeals of Oklahoma County cases. Oklahoma County does direct appeals of Tulsa County cases. This isn't something that's going to require the state of Oklahoma to spend a lot of money to fix the problem. It's an easy problem to fix. And I would think Tulsa people coming down the turnpike is not a likely phenomenon. I think that's more common or more likely than an Oklahoma County public defender going to Bob Ravitz and asking him for money to prove how unreasonable he was. Having some of our prior cases suggest that there's not a structural problem arising from that, or will this be the first opinion where we need to decide that one way or the other? I believe, Your Honor, what you're referring to are Smallwood and the unpublished opinion in Carter v. Gibson. I think those are the two cases you're referring to. In Smallwood, and I think this is a significant difference, Mr. Smallwood was raising a substantive, ineffective assistance of counsel claim as a claim for relief based on his argument that the Oklahoma County Public Defender's Office had a structural, inherent conflict. We're not raising this as a substantive claim for relief, which is different because since it's not a substantive claim for relief, AEDPA rules don't apply, deference doesn't apply, exhaustion doesn't apply, all of those other rules don't apply. So this Court is ruling on that on a clean slate. In Carter v. Gibson, which was unpublished but it was raised in the Respondent's Brief, so I'll address it. Significantly, Carter addressed this question in two different contexts. First, the Court looked at whether the default was adequate based on the fact that the trial lawyer and the direct appeal lawyer were working together in Oklahoma County. And significantly, this Court found that, yes, it is inadequate for exactly that reason, because it would put the trial lawyer in a very awkward position to have to assist direct appeal counsel in proving his own ineffectiveness. Then, when the Court got to consider the underlying merits of the substantive claim of ineffective assistance of counsel, again, subject to AEDPA deference and everything else, the Court said that the claim failed. But on the adequacy question, which is the question that we're addressing now, this Court said that it was indeed inadequate for exactly the same reasons we're raising that. Well, how does Fairchild play into this? Fairchild is distinguishable, Your Honor, in two ways. One way, I think, actually supports our argument. The first holding in Fairchild was that Martinez, as a general rule, doesn't apply in Oklahoma because of the existence of a functioning Rule 311 process that allows ineffective assistance of counsel claims to be raised on direct appeal. Our position is there is no functioning 311 process in this case or in other Oklahoma County and Tulsa County cases, as found by canon, because in order to have a functioning process, you need to have separate counsel, and we don't. That's right. And so your saying counsel argument really is the way you get out from under Fairchild. Correct. All right. I would also, just to complete the point, Fairchild also looked at, and this is a related point but subtly different, Fairchild looked at a different issue than what we're talking about. Fairchild looked at whether 311 per se is adequate. We're not challenging whether 311 per se is adequate. We're challenging whether the functional effect of having the same counsel brings this within Trevino rather than Martinez. So for those reasons, just to summarize, the first procedural default, which is the procedural default caused by not having raised it on direct appeal,  because it's inadequate due to the lack of separate counsel. And you have new counsel on first post conviction, right? Right. Ms. Miller was out of the picture. Right. So now we have counsel on first post conviction, and that's where Martinez and Trevino come in because what Martinez and Trevino stand for is the proposition that every defendant, every capital defendant certainly, has to have one fair opportunity to present an ineffective assistance of counsel claim with effective counsel. And it's a claim there that the post conviction counsel was ineffective because they didn't raise the trial counsel in effectiveness. Correct. Okay. And they didn't investigate it. Yes. So because if we're correct on the first argument, which is there was no separate counsel, that then makes first post conviction the first opportunity to have raised ineffective assistance of counsel. Therefore, ineffectiveness of post conviction counsel under Martinez and Trevino becomes cause to excuse that default. So we overcome that default through Martinez and Trevino. As far as the prejudice that we need to show, the prejudice is, I would submit, very clear just from the strength of the merits of the ineffective assistance of counsel claim in and of itself. Well, going to that for a second. Talking first about the claim of prejudice or related to the ineffective assistance of counsel, I'm a little struck by or I'm puzzled by how we can ever consider jurors, Deadman's affidavit for anything in light of Capps, our decision in Capps, in the light of Federal Rule of Evidence 608. I mean, what he says is irrelevant, isn't it? Perhaps. Perhaps is good. But we can't consider, I mean, the impact of that on what the jury does, right? But I don't think we need that. This court is, there's the Victor Hooks case, there's all sorts of cases from this court that talk about the significance of this type of lack of mitigation evidence that was so easily findable if counsel had simply looked for it. Well, as Grant and Littlejohn, too, make pretty clear, all organic brain damage is not created equal. It's not just enough to say it's organic brain damage, right? Correct. And this, not to certainly denigrate in any way the evidence in Littlejohn, but we're not talking about ADHD here. We're talking about significant brain damage. We're talking about a man that has a steel plate in his head because he was thrown through the windshield of a bus. We're talking about post-traumatic stress disorder. We're talking about gold standard brain damage, organic structural brain issues. Well, the question is what their impact is on him and his activities. And so, you know, how that brain damage evidence would affect him, right? It's not just enough he's ill. It's how they affect him and whether it's treatable. Correct. But the additional piece that we have in this case is the witness that they did call at trial who testified about Mr. Cuesta's IQ results and opined that as a result of those IQ results, he couldn't possibly have brain damage. You're talking about Dr. Choka? Correct. We've now been able to determine that the test that he applied was inadequate. It was normed through standards that didn't apply to the group of people that Mr. Cuesta Rodriguez applied to. It was affirmatively not only not helpful, it painted a completely dishonest and inaccurate picture of Mr. Cuesta Rodriguez's position. Well, clipping from prejudice to performance, was it the lawyer's responsibility to say, Dr. Choka, you know, your report is inadequate. You know, you haven't normed this correctly. You haven't used the right stuff. I mean, that's not the lawyer's job, is it? Well, two quick answers to that. One, prefatory, and then I'll get to the substance. Prefatorily, I'm not even sure that this issue is properly before your honors, because until we got here, the state never even challenged the merits of the ineffective assistance of counsel claim. So as far as the record shows, up until their brief in this court, I believe the issue is waived from the state's perspective. It was at play before the OCCA, right? They didn't reach it, that's right. But the bottom line is, for our purposes, we can affirm on any ground supported by the record, can't we? Well, but the state can also waive issues, which our position is they waived it. But getting to the substance, sure, the lawyer hires an expert and the expert gives the opinion, but the lawyer has to follow the red flags and investigate and get the information that's necessary and then interact with the expert to make sure that the expert's opinion is accurate and helpful and persuasive. Well, if the expert says the red flag is green, it is not red, and then your petitioner doesn't indicate that there's anything resulting from those two things that occurred earlier, the hurricane where he went through the bus window and what happened when he fell the other time. The petitioner didn't say it. His family didn't say it. So what is the lawyer supposed to do? I mean, you know, his family didn't give any indication he had any organic, well, he didn't have any consequences from whatever purported organic brain damage. He didn't say he had any consequences. The expert didn't say he had any consequences. When does it stop? I mean, when does a reasonable counsel say, I've done my investigation and there's enough? Your Honor, I believe the Supreme Court addressed that exact situation in Rome Pilla. Oh, really? In which case? Rome Pilla. You have to investigate the red flags. Just because the client doesn't give you the information doesn't mean you can stop. That's what an expert's about. That's what going to Cuba. Have you ever been to Cuba, Mr. Lieber? I wish I had, but I haven't. I mean, this lawyer went to Cuba, interviewed his family, and then had testimony related to that. None of the family indicated that there was any issue. Am I right on that? Well, correct. And the lawyer in Rome Pilla interviewed members of Mr. Rome Pilla's family, and none of them told him the same thing either, but the Supreme Court still found it inadequate. But in Rome Pilla, there was no corresponding person to Dr. Choka, right? Correct. And certainly the attorney is allowed to lie to some extent on what Dr. Choka said. As long as you do the work necessary to prepare your expert to do the work that you need them to do. It's notable in this case, too, that Ms. Hammerstein, trial lawyer, clearly recognized the need for a neuropsychological evaluation because she made a request for one, and the request was denied. She recognized the possibility for that, and that was early on, before she went to Cuba. Right? She went to Cuba. She interviewed witnesses. Family said no problem. She had Dr. Choka who said no problem. She had her petitioner who said no problem. At that point, of course, well, I would assume good lawyers are going to file early on and make sure that they can get the money. Well, she comes back. It was predicated on the medical records, right? She didn't get the medical records. She comes back. She has these interviews. Why are we not entitled to presume that at that point, picture changed. She made a strategic decision. I really don't need it now. I think there's a difference between a presumption and an assumption, and, Your Honor, with all respect, I would say that falls in the assumption category. And burst my bubble. What else is there that would burst that assumption? Because we're here in DeNovo. We're in DeNovo land right now. Correct. So we don't know why she made that decision, but I'll tell you what, at an evidentiary hearing, we would find out. But doesn't Strickland tell us that we don't need, in situations like this, we are supposed to, and I'll use Strickland's word, presume the counsel operated in a reasonable fashion, and when there was a point A, when she put in the request, a lot of stuff happens. Point B, she comes back without the medical records, and she decides to march forward. Why, under Strickland, can't we presume there was a reason for that? Because there's nothing to suggest that she, the denial of the funds was predicated on getting the medical records. And then, apparently, she never got the medical records. She couldn't get them, right? I don't think you're denying that they didn't have them, right? It's not like she didn't try to get them. They just destroyed them. Okay, but she still recognized the need for that expert, and a competent counsel would have tried to find a different way to get that expert. I notice that I only have 20 seconds left. I'll give you some rebuttal.  Let's hear from the State. Thank you. You're welcome. May it please the Court, I'm Caroline Hunt from the Oklahoma Attorney General's Office on behalf of Respondent. So I'll start where opposing counsel did with ground one concerning the allegation of ineffective assistance of counsel. This claim was raised for the first time in Petitioner's second state post-conviction motion. So, therefore, he must overcome two hurdles in both of these hurdles. First, his failure to raise the claim on direct appeal, which ran afoul of Oklahoma's requirement that ineffective assistance claims be raised on direct appeal, and his failure to raise this claim in his first post-conviction motion, which ran afoul of Oklahoma's bar on successive post-conviction. Why doesn't Trevino get them there? I'm sorry, Your Honor? Why doesn't Trevino get them where they need to get? First, Trevino comes in only if he's shown that counsel weren't separate. If this Court doesn't agree with him on that first part, then it doesn't matter what Martinez and Trevino because of the failure to raise the claim on direct appeal. And then second, even if this Court were to agree with him that counsel weren't separate, this Court is bound by this Court's precedent that Martinez and Trevino apply only where the state system as a whole precludes or makes virtually impossible the raising of ineffective assistance on direct appeal. Petitioner contends that he falls within Trevino, but he's got to meet that virtual impossibility showing. Another description in Trevino was that the possibility of raising a direct appeal ineffective assistance claim was only theoretically available. Why don't we send it back for an evidentiary hearing? This principle or this question is going to pervade a lot of capital appeals we have up here. This seems like a pretty good vehicle to answer that question once and for all. Your Honor, I have a two-part answer to that. The first has to do with forfeiture, and the second has to do with the lack of specific allegations that entitle him to an evidentiary hearing. The first reason this is not a good case to send back for an evidentiary hearing is I would ask this Court to consider how this claim about counsel not being separate has evolved and transformed from the district court and find, as this Court recently did in Grant in finding an argument to be forfeited, that both the totality of the relevant language and structure of the arguments in the district court make clear that Petitioner didn't preserve his current arguments for appellate review. So specifically in this case, in the district court, Petitioner's focus was a cause and prejudice argument that Direct Appeal Counsel had abandoned him by failing to conduct an extra record investigation in this provided cause for his default. Any reference to counsel being from the same office was merely an afterthought. The district court did not recognize him to make this lack of separate counsel argument. And, in fact, the State said, to the extent he's hinting at this argument, it is so inadequately developed as to be waived and you, district court, should not address it. And that's exactly what the district court did. It didn't address it. And now in his motion for COA before this Court and in his briefing, this argument has become about the inadequacy of the bar and the claim that trial counsel and Direct Appeal Counsel weren't separate. So that's the first reason why this case is not a good vehicle to send back for an evidentiary hearing if these are arguments that have been forfeited. And then the second reason this shouldn't go back for an evidentiary hearing is to be entitled to an evidentiary hearing and to put the adequacy of the bar at issue, Petitioner has to come forward with specific allegations to shift the burden to the State and he hasn't done that. He admits in his reply the extent of his arguments are that Direct Appeal Counsel and Trial Counsel were from the same office and down the hall from each other. And now his argument has again evolved and he says that they were adjacent to each other and that there are inherent conflicts in this situation. However, I have to disagree with Petitioner's point that he says, based on canon, we have counsel who are presumptively conflicted and, in fact, the opposite is true. They're presumptively not conflicted. If it were enough that counsel are from the same office from each other to get an evidentiary hearing, then that would always be the case. The second you said they were from the same office as each other, whereas this Court has said that might raise a concern that you have to come forward with specific allegations  And on that point, too, I would like to point out Ms. Miller's declaration in this case. As this Court has already discussed, all she said was, I conducted no extra record investigation and focused only on record issues. And so in this case, what she doesn't say speaks volumes. Petitioner contends, well, this is not the same as being in an evidentiary hearing, being sworn in federal court. This is just an affidavit that goes into a file somewhere. But, in fact, she says, I, her name, do swear under penalty of perjury under the laws of the United States of America and under the state of Oklahoma, and the following is true and correct. So it is disingenuous to suggest that this is some affidavit that would be put in a file somewhere and that she wasn't under an obligation to be truthful. And I think this underscores two points. First, that this argument was not adequately developed in the district court and the focus there was on abandonment and the lack of extra record investigation. And second, that Petitioner has simply failed to come forward with enough to either shift the burden to the state or be entitled to an evidentiary hearing. And as this Court has discussed in canon, it's distinguishable first because we have a pro se defendant and also there was an allegation of a policy. And there has just been no specific allegation about what exactly the concern is here. Is it the office itself? Is it Ms. Miller herself? And if it's the latter, then she could have said as much in her declaration. And as far as the office itself, as cited in my brief, there are a history of Oklahoma County public defender appellate attorneys raising ineffective assistance claims against their trial level colleagues. And then I would like to go back for a moment to the discussion about Martinez and Trevino. The other reason this isn't a systemic problem in this state is because the Court of Criminal Appeals, this is in the 2005 case of Davis, said that it won't apply the bar where trial counsel and direct appeal counsel weren't separate. And then I would also like to move on to discuss some of the merits of Petitioner's underlying ineffective assistance claims. Before you do that, let me ask you a question. Let's assume, just assuming for argument's sake, that we found that Martinez-Trevino applied here, what would be the nature of the evidence that we could consider for purposes? I mean, they've submitted additional evidence, and I think cited a case out of the Ninth Circuit, Dietrich, and a case out of the Eighth Circuit, Sasser, for the notion that we can consider all of their evidence now in making a determination about ineffective assistance of counsel. What's your position on that? My understanding of Penholster, Your Honor, is that the diligence requirement still has force even when, excuse me, a claim is receiving de novo review that did not receive merits review in state court. And so that is the state's position that basically nothing. These claims have to rise or fall on their own merits. And how could they honor their diligence requirement when the court would deem them procedurally barred? I mean, when they tried to raise the ineffective assistance of counsel claim, the OCCA shut them down. So in order to show diligence, were they able to do? For one, they could have done it much sooner at a time when it would not have been barred. But note the predicate of this whole argument is they passed a Trevino bar, which means that we're allowing them to make the claim because there is ineffective assistance of counsel and there was a systemic bar to them raising it earlier. So the systemic bar, it would seem to me, deals with they're not raising it earlier. So the question then becomes why is it diligent to try to get this, to get past the evidentiary, I mean, get past the bar at the OCCA level? Your Honor, this was the second post-conviction motion filed contemporaneously with their habeas petition. And so for one thing, perhaps diligence would have been at least raising that at a time when that post-conviction motion would have been timely. But even this, even the second post-conviction motion was untimely under the 60-day rule. And so it can't be diligent to file something at a time when even setting aside the other bar, and like you said, Your Honor, overcoming those bars, you still have yet another bar that this is an untimely post-conviction motion. But that state rule only applies to the state ineffective assistance and, you know, not to the constitutional ineffective. I just don't see why the 60-day bar really gets you much here. The state's position is just that it shows a lack of diligence. Okay. As discussed in my brief, turning to the merits of the ineffective assistance claims, nothing about brain damage or post-traumatic stress disorder would have given Petitioner more in terms of treatability or explaining the crime than the perfect storm mitigation case actually presented by counsel based on borderline personality disorder, which is a mental health diagnosis appearing in the DSM, depression, and substance abuse. And there are a number of things about this crime and its targeted nature and the length of the episode that show why brain damage and PTSD don't explain the crime. First, there's the fact that Petitioner doesn't shoot the daughter. He claims that she had a baseball bat and was even feeding him with a bat, but the fact that he doesn't shoot her reinforces the cold and calculated nature of this crime. Dr. Uriente, the habeas expert who claims Petitioner has brain damage, analogizes him to an out-of-control semi-truck. And Dr. Stewart, who claims he has PTSD, says that he had almost nonexistent executive functioning and couldn't form the specific intent to kill. But then why would he not shoot the person whom he claims has a baseball bat and instead target solely Ms. Fisher? This shows that this was... Because Ms. Fisher had done him wrong. I mean, the daughter hadn't done anything to him. I mean, I don't see why that argument makes sense. The live-in person is the target of his activity. Your Honor, that's exactly right. That's exactly what undermines Dr. Stewart's point that he lacked the specific intent to kill. Why does it, is what I'm getting at. He could be an out-of-control, whatever the analogy is, truck, against the person who's hurt him. Why does that mean he has to kill everybody in the room? Well, certainly that is an argument for Dr. Uriente, but focusing specifically on Dr. Stewart to say that he lacks the specific intent to kill when he clearly targets a specific person, that undermines Dr. Stewart's point. And then as far as the out-of-control truck language from Dr. Uriente, there are more reasons, even more in the record, that show why that is not an apt analogy or would not be compelling to the jury. First, we had indications of Petitioner's intent to kill as early as February of that year, three months before the crime. He writes letters to his mother in which he calls Ms. Fisher a whore and says that he is contemplating killing her because that's what she deserves. Hours before the murder, he leaves a note saying, F-you, and then he uses a flirt for women, goodbye. During the murder, the daughter asks him, why are you doing this? And he says very clearly to the daughter, because she, meaning Ms. Fisher, is cheating on me. Let me ask you, there was the footnote in the OCCA description, factual description about the eyes. Is there any, was there record evidence to indicate that he, in fact, was shooting her in the eyes relative to her use of the phrase, I've set my eyes on somebody else or some version thereof? I don't think there, Your Honor, there's not such a clear connection as that. I think there is evidence for a jury reasonably to infer that fact. We have testimony from Charlie Davis, the ex-boyfriend, and he says that her use of that phrase means I'm interested in someone else. And then we also have testimony from the daughter that she, and she was very clear on this on the stand, I saw him take aim at her and shoot, that he purposely aimed at her, and a jury could reasonably infer from all that that that's why he specifically targeted her eyes. Okay, but that's what we got. Yes, Your Honor. All right. Can I take you back to the February 26, 2003 letter that you just referenced? That came, that was, the jury was aware of that, came up in the closing argument. Yes, Your Honor, you're talking about the February letter? Oh, I'm sorry if I said a different one. Oh, no, I just wanted to make sure I heard you. Yeah, I think that is what you said. Yes, that is on pages 794 to 96 of the transcript. And you're right, it's got all of this inflammatory language and threatening language and here's what's going to happen kind of language. Do you understand the organic brain damage claim from the doctors to be that that had something to do with his anger? Because the anger is I'm going to lose my house, this is not fair, she tricked me into this relationship and now she's going to move her whole family up and I'm going to be out on the street. That seems to be the tenor of it. Is the organic brain damage only that once he had a certain level of anger, he couldn't pull back from that? I'm still struggling a little bit with what does the organic brain damage mean if you're sitting on the jury? I'm not quite sure if that is exactly Dr. Uriente's theory that once there's a certain level of anger, he can't control himself. But I think in that sense, even if we give them the benefit of that theory, that that's how brain damage could explain that crime, it gives no benefit beyond the mitigation case that was actually presented. And I will say too, and one thing borderline personality disorder had over the brain damage is counsel was able to make the case that this was limited to his relationships with women. And certainly I don't think there's a similar kind of cabining with Dr. Uriente and the brain damage. And that's important in this case because continuing threat was alleged. And so when we're looking at this from counsel's perspective, where she wants to put on this mitigating case that explains the crime, but at the same time doesn't contribute to the state's continuing threat case, you know, the brain damage out-of-control semi-truck is not great as far as continuing threat, whereas with the borderline personality disorder, she argues that petitioner's problems were limited to his relationships with women. And here I'm reading from Defense Counsel's closing argument on page 1300 of the transcript. You have no evidence of violence in Carlos Cuesta's life beyond his relationship with Olympia Fisher. There's some indication from Dr. Choka that the wife, Mariana, made an allegation and got a protective order, but there was also an indication that she and Carlos Cuesta remained on good terms. What you also know is in the Department of Corrections, Carlos Cuesta will not be housed with women. So even giving them the benefit of how brain damage might be presented in a way, the way you just described, Judge Phillips, to explain the crime, counsel was able to take borderline personality disorder combined with depression and substance abuse and make the same case for how borderline personality disorder and those other factors explain the crime, and that's a reasonable decision. Was borderline personality disorder treatable? No, Your Honor. What Dr. Choka said basically is that there's no cure, but that it can be here. It was heavily exacerbated by petitioner's substance abuse and depression. And Dr. Choka testified that he was receiving psychiatric medication in jail, and also, again, the factor that, as counsel pointed out, he would not be housed with women, not be in relationships. And so in that sense, Pippin's counsel was able to make a case that while it might not be treatable, it could be well managed, which would, again, help cut against the state's continuing threat case. So do I understand the position to be, your position to be, that the organic brain damage would not have added anything to, essentially, the trajectory of their argument related to his mental condition, and if anything, it would have been more harmful because it would have been less cabined? Yes, that's exactly right, Your Honor. All right. Yes, yes. And I would like to make some additional points as to Dr. Stewart and how thoroughly he would have been impeached on cross-examination where he presented. He claims on page 37 of his report that after the murder, petitioner didn't flee but remained with the victim, and that isn't the behavior of someone who intentionally commits murder. This completely ignores the fact that the petitioner couldn't go anywhere because the house was surrounded by the Oklahoma City Police Department SWAT team, and the police testified they see lights in the house going on and off. They see someone peeking out. So we know he's not simply just staying with the victim's body, and, in fact, he and Ms. Fisher were found in different rooms by SWAT when they eventually made entry. And I, petitioner mentioned, and he might discuss in reply, that he wanted to discuss the mitigation instruction, and so on that point I would just say briefly that this court recently affirmed the denial of habeas relief on a combination Boyd prosecutorial error claim where the prosecutor in rebuttal argued that in order to be mitigating, Grant's evidence must reduce his moral culpability or blame, and here the prosecutor made comments far less pointed in saying simply that the jury should consider whether certain items of evidence proffered by petitioner reduced his culpability or blame. And, therefore, if the Court of Criminal Appeals wasn't unreasonable in finding there wasn't a reasonable likelihood that the prosecutor's statements and Grant's precluded the jury from considering his mitigating evidence, then petitioner certainly can't show that the Court of Criminal Appeals was unreasonable here in concluding that he was not denied a fundamentally fair trial. Let me ask you about the second part of that prosecutorial argument. I mean, the second part is the sort of fundamental fairness argument, the guilt trip argument, and the one related to shame, human shield, I guess, shame on him, human shield. Yes. Why isn't the shame on human shield argument improper in the sense that it is an attack on the defendant, a personal attack on the defendant? We have our cases that speak to that issue, and, of course, more importantly, the Supreme Court has its cases that speak to that issue. Why isn't that? Why shouldn't we construe that to be such? And if we should not, what's your strongest case that says that's not an improper attack on the defendant? Your Honor, first is the fact that this Court is not addressing this claim on de novo review. And so the question is not a straight-up question of whether it's proper or improper, but whether the Court of Criminal Appeals could reasonably conclude that it was proper. And here you're – sorry, yes. You're correct that the Court of Criminal Appeals concluded that, minus the guilt trip comment, that these were proper comments. And the reason that these comments are proper is because we have to consider them in the context in which they were made. And here we have statements by defense counsel in closing that are inappropriately asking for sympathy for the petitioner's family, when that is not something that is considered to be relevant mitigating evidence. And, in fact, this Court has said that it injects arbitrary considerations into capital sentencing. And that is from pages 1303 to 1304 of the transcripts. And it's cited in my brief. And to not get too sidetracked from the answer, I will just read, for example, one of the paragraphs. In fairness, sympathy, and mercy, refuse the death penalty because there's a family 90 miles from our shores who are rolled away who will be hurt, his mother, Evie, his sister, Ariel, and his brother, Joaquin. And there are about four or five paragraphs that go on in that vein. And so these statements by the prosecutor have to be considered in that context when this Court considers whether it was reasonable for the Court of Criminal Appeals to conclude that they were proper. Well, did they come up? All right. Well, two-part question. Did those, shame on him, human shield, did that come up only in rebuttal closing argument? I believe the shame on him, you're right, Your Honor, that I think one of those did come up in the opening, the prosecutor's opening statement. So they were not entirely in response to the allegedly improper argument of defense counsel? That's correct, Your Honor. Okay. That's the first thing. The second thing is, I guess what I'm getting at is I get your point that we're not looking at this de novo, but is there some law that would lead us to believe, because there is case law that says that you cannot make personal attacks on the defendant, is there case law that would lead us to believe this comment falls without the scope of that? I mean, it's outside of the scope of that, that you're aware of. I know this is sort of an amorphous area with this fundamental fairness thing, but what would be the best thing that you would think of to say that's nothing, that the OCCA was clearly right to view that as a, if not proper, not improper comment? I am not sure of the best case, Your Honor, because I cite Landon Pickens with very similar comments, but I don't recall whether those were decided more on the fundamental fairness aspect and not on whether these are proper comments. Let me just quickly glance at those. And understand where I'm going with this. Yes. Even if we were to find the fundamental fairness that there was not a fundamentally unfair trial, we're still going to have the question of what to do with these comments for purposes of cumulative error. Because Cargill says that the rubric of fundamental fairness has embedded in it a prejudice component. So if those comments are improper, then they get lumped into whatever cumulative error thing we do. So we're clearly going to put guilt trip in there, right? Because the OCCA said that. So the question is, what I'm trying to get at is, is there any basis to put shame on him human shield in there, too? So I would say, so bland I think would be a good case. Reading through it again, there the comment was, do we as a society or as a system of justice let those things act as a shield from accepting the full responsibility of his actions? And here is what this Court says. As long as the jury is properly instructed on the use of mitigating evidence, the prosecution is free to comment on the weight the jury should accord to it. Mr. Bland does not contest the propriety of the mitigating evidence instruction, which provided in pertinent part that the determination of what circumstances are mitigating is free to resolve under the facts and circumstances of this case. The prosecutors, while critical of Mr. Bland's mitigating evidence, never told the jury it could not consider Mr. Bland's mitigating evidence. The challenged prosecutorial argument was consistent with the jury instructions and bore only on the weight of the evidence. And I interpret that as a holding that these were not improper arguments. And so that would be one case. And then as far as Pickens. You had mentioned Pickens, yeah. Yes. So Pickens was the guilt trip argument. Well, I'm concerned now. Sorry. I'm sorry to cut you off. I'm concerned about the human shield. Does Pickens speak to that as well or no? I don't believe so. I think the closest I was able to find on the human shield was Bland. And there it didn't say human shield but said should we allow him to use those things as a shield. Okay. And I don't want to eat up too much of your time. Go ahead. Okay. And as far as Pickens, it was a slightly different context because it looks like glancing back through it is a Caldwell error. And so it was whether it really, you know, led the jury to believe that there would be later review and took away from its responsibility to impose death. And so I don't know that there's anything as helpful in that case. And so you're right, Your Honor, as far as deciding whether there's error that is not as helpful but still helps inform this court's fundamental fairness determination and whether the Court of Criminal Appeals was reasonable. And to wrap up, this case involves all the same jury instructions that we had in Grant and Harris, broadening the scope of mitigating instructions the jury consider. We have repeated comments from the prosecutor encouraging the jury to consider petitioner's evidence. And we also have instructions this court found to be critical in Grant informing the jury that it shouldn't treat the lawyer's arguments as expressing the governing law of the case. In opening instructions, the jury was told it was the trial court's responsibility to, among other things, instruct them on the law, while it was the attorney's responsibility to present evidence,  and that no statement or argument of the attorney's is evidence. And that's page 316 of the transcript. And they're also told on page 318 that the attorney's arguments are for persuasion only. And if this court has no further questions, I would ask the Court to please affirm the denial of habeas relief. All right, counsel. Thank you. Could you, Robert, put three minutes on for rebuttal? Three. Thank you, Robert. I appreciate that. You're welcome. I think just to start with, since it's where my colleague left off, I want to address the mitigation instruction and argument issue, and simply to make one point which, in our view, distinguishes this case completely from Grant and Hansen. The issue, as Judge Holmes, as you described it in your majority opinion in Grant, was that the test of constitutional error is not whether the arguments were improper, but rather whether there is a reasonable likelihood that they had the effect of precluding the jury from considering mitigating evidence. That's at page 938 of the Grant opinion. Well, in this case, we have a note from the jury. And in the Danny Hooks v. Workman case from this court, which was 606 F. 3rd, 715, a 2010 case, what the court said is a similar prosecutorial misconduct issue there and a jury note. And the way this court described the jury note was, quote, a singularly clear indication the prosecutor's misconduct did, in fact, mislead the jury. The same is absolutely true here. Why is that so? I don't follow that, because all that really shows to me that the jury note is that the jury read the instruction, had a question. What does that word mean? Well, they read the instruction because the prosecutor kept telling them that they couldn't consider anything as mitigating unless it went to moral culpability. And their only question is, what does culpability mean? What is it that we're being told we have to decide? And the only answer, and frankly, the judge's answer made it worse. He said it means blame or blamable. So it was reinforced for the jury that the only thing they could consider as mitigating, sure, consider it all. You have to consider every piece of evidence that was introduced. But you can only give it mitigating weight if you find it goes to the level of moral culpability or how blamable is he. That's not what Lockett says, and that is absolutely not what Eddings says. Do you think that all 16 of the mitigating circumstances that are given in a separate jury instruction go to moral culpability? No. Then why would the jury think that? Because that was a list of mitigating circumstances that Mr. Cuesta-Rodriguez's attorneys proposed, but the judge also told them, and this is in instruction number 16, which is one of the standard instructions, he said, I do not express any opinion whether or not aggravating circumstances or mitigating circumstances did or did not exist. So they're told just because we list them doesn't mean they're mitigating. They're only mitigating if they go to moral culpability. And if they don't, you can't consider them as mitigating. That's the Lockett violation. And the note makes it clear in this case that that's what the jury was focused on, and that's what makes this case different from Grant and Hanson. Unfortunately, I do see that I am out of time. So I appreciate the court's patience. Thank you, counsel. You used your time well. I appreciate the arguments. Those were helpful. Counsel are excused, and the case will be submitted.